AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California



FILED
CLERK, U.S. DISTRICT COURT

**8/31/2022**

CENTRAL DISTRICT OF CALIFORNIA
BY: ____JB____ DEPUTY

|  |  |
|---|---|
| United States of America<br><br>v.<br><br>STANLEY CAMARENA and<br>MANUEL PEREZ,<br><br>Defendants. | Case No.    2:22-mj-03432-DUTY |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of August 23, 2022, August 29, 2022, August 30, 2022, in the county of Los Angeles in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of Firearms and Ammunition |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Jamie J. Pederson*
*Complainant's signature*

Jamie J. Pederson, ATF Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:    August 31, 2022

_____
*Judge's signature*

City and state:    Los Angeles        , California

Hon. Margo A. Rocconi, U.S. Magistrate Judge
*Printed name and title*

AUSA: Jenna W. Long, 213-894-8692

**AFFIDAVIT**

I, Jamie J. Pedersen, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1.     This affidavit is made in support of a criminal complaint and arrest warrant against STANLEY CAMARENA ("CAMARENA") and MANUEL PEREZ ("PEREZ") for a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm.

2.     This affidavit is also made in support of an application for a warrant to search 1598 Palomar Mountain Place, Hemet, California, 92545 (the "SUBJECT PREMISES"), as described more fully in Attachment A for evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 922(a)(1)(A) (Unlicensed Dealing in Firearms), 922(g) (Felon in Possession of a Firearm), and Title 26, United States Code, Sections 5861(a), (c), and (e) (Unlawful Dealing in, Receipt or Possession of, and Transfer of a Destructive Device) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

3.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrants, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and

statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF AFFIANT**

4.    I am employed by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), United States Department of Justice, as a Special Agent ("SA").  I have been employed in this capacity since May 2019.  I am currently assigned to the ATF Los Angeles Field Division and am charged with investigating violations of federal arson, explosives and firearms laws and regulations.  I regularly refer to these laws and regulations during the course of my official duties.  I am a graduate of the Criminal Investigator Training Program instructed at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia and have completed specialized training at the ATF National Academy in the fields of arson, explosives and firearms.  Prior to being in law enforcement, I graduated from the University of Southern California, where I received a Bachelor's of Arts degree in Political Science. During my employment with ATF, I have participated in several investigations involving individuals illegally possessing and/or trafficking firearms.  I have also participated in several investigations involving the unlawful transportation, possession, and distribution of controlled substances, including crack cocaine, methamphetamine and marijuana.  Furthermore, I have participated in investigations involving criminal street gangs engaged in the aforementioned criminal activities.

### III.  **SUMMARY OF PROBABLE CAUSE**

5.    Between August 23, 2022 and August 30, 2022, CAMARENA and PEREZ sold several firearms and ammunition on three separate occasions to an ATF undercover agent (the "UC").  On two of these occasions, specifically, on or about August 29, 2022 and August 30, 2022, CAMARENA transferred to and sold the UC six pipe bombs.  As convicted felons, CAMARENA and PEREZ are not permitted to possess any firearms.  Phone numbers used by CAMARENA and PEREZ list the SUBJECT PREMISES as the registered address, and GPS location data reviewed by law enforcement is consistent with residing at that address.  Additionally, cars used by CAMARENA and PEREZ in the above-described sales have been seen at that address overnight between August 29, 2022 and August 30, 2022.  CAMARENA's girlfriend informed ATF Special Agents that she resides at the SUBJECT PREMISES and CAMARENA stays with her at the SUBJECT PREMISES regularly.   On the evening of August 30, 2022, CAMARENA's girlfriend also informed ATF Special Agents that PEREZ resides at the SUBJECT PREMISES.

### IV. **STATEMENT OF PROBABLE CAUSE**

6.    Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

## A.    The CI introduces the UC to CAMARENA

7.    Beginning in the Spring of 2022, A LAPD/ATF Confidential Informant (the "CI") [1] exchanged FaceTime video calls and text messages with an individual later identified to be CAMARENA, on among other numbers, 951-622-9238.  CAMARENA told the CI he could sell firearms and methamphetamine.

8.    CAMARENA once told CI she could reach him on his cousin's number, which was 951-445-6669.  According to subscriber records of T-Mobile this number is registered to PEREZ and lists the SUBJECT PREMISES as the billing address.

9.    The CI introduced the UC to CAMARENA.  Specifically, she told CAMARENA that her cousin would contact his phone number.  The UC then texted the number the CI gave him, 951-622-9238.

## B.    On August 23, 2022, CAMARENA and PEREZ Sell the UC Four Firearms

10.    Between August 16, 2022 and August 23, 2022, the UC and CAMARENA exchanged a series of unrecorded FaceTime video calls, phone calls, and text messages.  Based on my review of the text messages and discussion with the UC, CAMARENA told the UC he would sell the UC eight firearms and one pound of

---

[1] The CI has been compensated approximately $3,000 thus far for his/her assistance in this investigation by the ATF.  Over approximately the past 10 years, the CI has been paid approximately a total of $140,000 for all of the assistance he/she has provided for his/her assistance on ATF investigations.  The CI has a prior misdemeanor conviction for shoplifting.  The CI has worked with ATF on several occasions over the past ten years and has consistently provided credible and reliable information.

methamphetamine.   CAMARENA also sent a photo of a ledger,
indicating price for various firearms and methamphetamine.
CAMARENA told the UC that he wanted $9700 for the eight firearms
and one pound of methamphetamine. The UC and CAMARENA agreed to
do the deal at approximately 12:45 p.m. on August 23, 2022, at
the Smart & Final Extra! located 845 S. Figueroa Street in Los
Angeles, California (the "Smart & Final") which is in Los
Angeles County, California, within the Central District of
California.

11.   Based on my review of recorded video surveillance, my
conversations with other law enforcement agents, and my own
observations, I learned the following series of events from
August 23, 2022:

a.   The UC was equipped with a camera recording
device.  The UC was given $13,000 dollars to purchase firearms
and narcotics.  LAPD officers and ATF special agents then set up
a surveillance team near the Smart & Final that CAMARENA and the
UC agreed to complete the sale.

b.   The CI accompanied the UC in the UC's car to the
Smart & Final on August 23, 2022.  The CI had once before met
CAMARENA in person but had seen him on video calls.

c.   At approximately 12:53 p.m., ATF Special Agent
Pedersen saw CAMARENA arrive in 2021 black Nissan Altima,
bearing California license plate 8YPM979 (the "Altima").  Also
present in the Altima, was PEREZ.

d.   At approximately 12:58 p.m., CAMARENA and UC
walked over to the Altima. UC entered the Altima and sat on the

driver's seat while CAMARENA sat in the front passenger seat. All firearms were on the backseat of the Altima covered by a blue blanket. The UC briefly inspected the firearms and agreed to purchase four firearms. CAMARENA stated he was unable to acquire four firearms and the pound of methamphetamine. UC and CAMARENA then exited the Altima and walked to the rear of the UC vehicle. CAMARENA, PEREZ and the UC continued to negotiate the price of the firearms. Shortly thereafter, CAMARENA and the UC walked back toward the Altima and offloaded the firearms from the backseat. CAMARENA and the UC carried the firearms to the UC vehicle. UC and CAMARENA continued negotiations regarding the price of the firearms and ultimately agreed upon $6,000.00 for the four firearms. It is to be noted that approximately twice the UC observed CAMARENA ask PEREZ how much the firearms would cost.

  e. I recovered, from the UC, a bag containing four firearms.  I determined the firearms to be:  a Ruger, model SR1911, .45 caliber pistol, bearing serial number 673-28107; a Century Arms International, model C39V2, .762 caliber rifle, bearing serial number C39U2A50577; a Spike's Tactical LLC semi-automatic rifle bearing no serial number; an AR style, privately manufactured firearm, unknown model, bearing no serial number; and approximately 590 rounds of assorted ammunition.

  **C. On August 29, 2022, CAMARENA and PEREZ Sell the UC Five Firearms and Gives the UC One Pipe Bomb**

  12. Between August 23, 2022 and August 29, 2022, the UC and CAMARENA exchanged a series of unrecorded FaceTime video

calls, phone calls, and text messages.  Based on my review of the text messages and discussion with the UC, CAMARENA told the UC he had five firearms and two pounds of methamphetamine to sell the UC.  CAMARENA told the UC that he wanted $9400 for five firearms and two pounds of methamphetamine. The UC and CAMARENA agreed to do the deal at approximately 1:00 p.m., on August 29, 2022, at the Smart & Final.

13.  Based on my review of recorded video surveillance, my conversations with other law enforcement agents, and my own observations, I learned the following series of events from August 29, 2022:

a.  The UC was equipped with a camera recording device.  The UC was given $11,000 dollars to purchase the firearms and narcotics.  LAPD officers and ATF special agents then set up a surveillance team near the Smart & Final.

b.  At approximately 1:03 p.m., ATF Special Agent Arellano saw CAMARENA arrive in 2018 silver Dodge Ram truck, bearing California license plate 13162C2 (the "Dodge").  Also present in the Dodge, was PEREZ.

c.  At approximately 1:05 p.m., PEREZ transferred the firearms from the Dodge to the rear compartment of the UC vehicle. CAMARENA stated he was unable to acquire the methamphetamine. At approximately 1:08 p.m., CAMARENA informed the UC that he had put a bomb in the bag with the firearms. As the UC pulled the firearms out of the bag CAMARENA reached in and pulled the presumed pipe bomb from the bag. At this time, UC, CAMARENA and PEREZ discussed the pipe bomb and what it was

made of. At approximately 1:10 p.m., UC, CAMARENA and PEREZ re-entered the UC vehicle and completed the transaction. UC paid PEREZ $1,500.00 for his personal firearm and paid CAMARENA $5,600.00 for the remaining four firearms.

       d.    I recovered, from the UC, a bag containing five firearms and one pipe bomb.  I determined the firearms to be:  a Remington, model 788, 308 caliber rifle, bearing serial number A6188617; a CGA, model SKS, 7.62 x 39mm caliber, bearing serial number 10388; a Mossberg, 20 gauge, pump action shotgun, bearing serial number U481443; a Demix, model M1911A1, .45 caliber, bearing serial number N781227. The firearm given to the UC from PEREZ's waistband, I determined to be a privately manufactured firearm, semi-automatic pistol, bearing no serial number.

       e.    The LAPD Bomb Squad took custody of the pipe bomb.  Members of the LAPD Bomb Squad, robotic assistance, examined the pipe bomb.  They determined the fuse and material contained inside were energetic and capable of creating an explosion.  The LAPD Bomb Squad, for safety, detonated the pipe bomb.  This demonstrated it was, in fact, a destructive device as defined in Title 26, United States Code, Section 5845(f).

    **D.**    **On August 30, 2022, CAMARENA Sells the UC Four Firearms and Five Pipe Bombs**

    14.    After the sale on August 29, 2022 through August 30, 2022, the UC and CAMARENA exchanged a series of unrecorded FaceTime video calls, phone calls, and text messages.  Based on my review of the text messages and discussion with the UC, CAMARENA told the UC he would sell him five firearms for $5,600.

CAMARENA also sent video of one privately manufactured firearm. The UC and CAMARENA/PEREZ agreed to do the deal at noon on August 30, 2022, at the Smart & Final.

15.   In addition, on August 30, 2022, before the scheduled sale CAMARENA sent the UC photos of packaging for the fuse cord that is lit to ignite an explosive device, like a pipe bomb, caps that are used as the end of a pipe bomb, and four completed pipe bombs.  Additionally, CAMARENA sent a video that depicted CAMARENA personally handling the completed pipe bombs and showing black powder.  CAMARENA told the UC that each pipe bomb would cost the UC $200.

16.   Based on my review of recorded video surveillance, my conversations with other law enforcement agents, and my own observations, I learned the following series of events from August 30, 2022:

a.   The UC was equipped with a camera recording device.  The UC was given $7,000 dollars to purchase firearms. LAPD officers and ATF special agents then set up a surveillance team near the Smart & Final and the UC agreed to complete the sale, which is in Los Angeles, California, within the Central District of California.

b.   CAMARENA told the UC that he had fallen asleep and would be late to the sale.

c.   At approximately 5:30 p.m., ATF Special Agents saw CAMARENA arrive in the parking lot of the Smart & Final driving the Dodge.  ATF Special Agents saw that in this truck

was an unknown female, later identified to Erandi Espinoza, two small children and a teenager.

       d.   Inside the UC's car, CAMARENA handed the UC three firearms, namely a privately manufactured firearm, unknown model, which appeared to be a 9mm caliber handgun, bearing no serial number; a shotgun, unknown gauge, with an unknown manufacturer; and a bolt-action rifle, with unknown caliber and unknown manufacturer.  CAMARENA then handed the UC a white towel containing items wrapped inside the towel.  When the towel was opened, the UC recognized there to be five completed pipe bombs, which looked similar to the ones in the earlier video that CAMARENA sent.

       e.   The UC paid CAMARENA $4,500.  After CAMARENA exited the UC's vehicle, the UC drove away.  LAPD Officers and ATF Special Agents arrested CAMARENA at this time.

   17.  An ATF Certified Explosives Specialist (the "CES") directed the UC to follow him.  The CES led the UC to an area where the UC was met by LAPD Bomb Squad, who directed the UC to leave his vehicle containing the above firearms and pipe bombs.  The LAPD Bomb Squad has taken custody of the five pipe bombs, to examine and render them safe by detonation.  The firearms were left in the UC's vehicle at the direction of the bomb squad and therefore have not yet been examined by the UC or other ATF agents.

   **E.   Erandi Espinoza's Statements**

   18.  After law enforcement detained CAMARENA, ATF Special Agents spoke to Erandi Espinoza within a nearby ATF Office

location. ATF Special Agents informed her she was free to leave, she was not read her *Miranda* rights.

19.  Espinoza informed ATF Special Agents that she resides at the SUBJECT PREMISES.  She described it as a residential home, with three bedrooms.  She said that two other adults also live at the SUBJECT PREMISES, PEREZ and his wife.  The three children present at the Smart & Final and another teenager also reside at the SUBJECT PREMISES. Ms. Espinoza told ATF Special Agents that CAMARENA sometimes stayed at the SUBJECT PREMISES and noted that he is friends with PEREZ.  Specifically, Ms. Espinoza said that CAMARENA has been at the SUBJECT PREMISES in the morning of August 30, 2022.  According to Ms. Espinoza, she has been in a romantic relationship with CAMARENA on and off for approximately four or five years.

    **F.   Criminal History**

20.  I have reviewed a criminal-history report from a law-enforcement database for CAMARENA.  From these documents, I learned that CAMARENA has previously been convicted of at least three felony crimes, each punishable by a term of imprisonment exceeding one year, including, but not limited to:

        a.    Trafficking in Illegal Drugs, in violation of Oklahoma Penal Code § 25400(a)(2), in Oklahoma City, Oklahoma, Case Number CF-2015-04265, on or about June 23, 2017, for which he was sentenced to six years' imprisonment; and

        b.    Possession of a Controlled Substance While Armed, in violation of California Health and Safety Code § 11370.1 in

the Superior Court of the State of California, County of
Riverside, Case Number FI605838, on or about December 7, 2016.

21.   I have reviewed a criminal-history report from a law-
enforcement database for PEREZ.  From these documents, I
learned that PEREZ has previously been convicted of at least
seven felony crimes, each punishable by a term of imprisonment
exceeding one year, including, but not limited to:

   a.   Burglary, in violation of California Penal Code
§ 459, in the Superior Court of the State of California, County
of Los Angeles, Case Number YA080458, on or about March 17,
2011, for which he was sentenced to 32 months' imprisonment; and

   b.   Possession of a Firearm by a Felon, in violation
of California Penal Code § 12021(a)(1), in the Superior Court of
the State of California, County of Los Angeles, Case Number
NA052416, on or about March 24, 2003, for which he was sentenced
to eight years' imprisonment.

   **G.   Interstate Nexus**

22.   Based on my discussions with the UC, who is also an
ATF interstate-nexus expert, I know that he examined the
firearms and the ammunition sold to him on August 23, 2022 and
August 29, 2022, and he knows, based on his training and
experience, that the firearms with known manufacturers and the
rounds of ammunition were manufactured outside of the State of
California.  Therefore, because the firearms and ammunition were
found in California, they must have traveled in interstate
commerce or from another nation to the United States.

**H.    Investigation of the SUBJECT PREMISES**

23.   Based on a search of records from the California
Department of Motor Vehicles, I learned that PEREZ reported the
SUBJECT PREMISES as his residence.

24.   ATF Special Agents saw the Dodge parked outside the
SUBJECT PREMISES intermittently between August 29 and 30, 2022.

25.   On August 30, 2022, ATF Special Agents saw the Altima
pull out of the attached garage of the SUBJECT PREMISES and
drive away.  Agents attempted to follow, but lost sight of the
Altima after some time.  The Altima later returned to the
SUBJECT PREMISES.  Agents have not seen the Altima leave the
SUBJECT PREMISES since the August 30, 2022 sale of firearms.

26.   LASD obtained California State Court Orders
authorizing disclosure and review of GPS location data for phone
numbers ending in -6669 (PEREZ's subscribed phone number) and -
9238 (the number the UC reaches CAMARENA on).  During the period
LASD has obtained GPS location data, both numbers have "pinged"
(connected to a cellular tower that can give an approximate
geographic location) in the vicinity of the SUBJECT PREMISES at
various times, including overnight indicating that CAMARENA and
PEREZ are on occasion sleeping at the SUBJECT PREMISES.

27.   On August 30, 2022, when CAMARENA arrived at the Smart
& Final, -9238 was still "pinging" in the vicinity of the
SUBJECT PREMISES, indicating CAMARENA left the phone at the
SUBJECT PREMISES.  The "pinging" of -6669 returning to the
vicinity of the SUBJECT PREMISES on August 30, 2022, was

consistent with when Agents observed the Altima return to the SUBJECT PREMISES.

## V.  TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

28.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.  Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices on their person and in backpacks or purses in their vicinity.

b.  Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.  Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and

from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

29.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

---

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

     d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

30.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

     a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

     b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of

data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

31.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.  Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.  In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress CAMARENA's and/or PEREZ's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of CAMARENA's and/or PEREZ's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

32.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. REQUEST FOR NIGHT SERVICE

33.   I request that the Court authorize investigators to serve the warrant during the nighttime, as set forth under Fed. R. Crim. Proc. 41(e)(2)(A)(ii). Nighttime service is warranted both to reduce the opportunity for the occupants of the SUBJECT PREMISES to destroy evidence, and to reduce the safety risk posed to officers executing the warrant, as well as residents who live in the area of the SUBJECT PREMISES.

34.   For the reasons set forth above, I believe that CAMARENA and PEREZ maintain illegal firearms and destructive devices, as well as materials for making destructive devices at the SUBJECT PREMISES.  Furthermore, surveillance indicates PEREZ likely remains at the SUBJECT PREMISES.  Given the law enforcement operation that occurred on August 30, 2022, if law enforcement were to wait to execute the warrant until the following day after 6:00 a.m., it would give PEREZ or other occupants the opportunity to remove, conceal, or destroy

evidence, including illegal firearms and destructive devices. In order to protect the safety of the law enforcement officers executing the warrant and to limit the risk of loss of evidence, nighttime service is warranted. Further, given the above facts, service of the requested warrant at night is warranted to reduce the risk that PEREZ will access and use firearms, destructive devices, or otherwise engage in violent confrontations with the law enforcement officers executing the warrant.

35. For all of these reasons I believe good cause exists for nighttime service of the requested search warrant.

**VIII.   <u>CONCLUSION</u>**

36. For all of the reasons described above, there is probable cause to believe that CAMARENA and PEREZ have committed a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the premises described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this ___31___ day of
August, 2022.

_____
HONORABLE MARGO A. ROCCONI
UNITED STATES MAGISTRATE JUDGE